PETER BUCKLEY, Appellant, *v.* CUNARD STEAMSHIP COMPANY, LTD., Respondent.

First Department, November 6, 1931.

*Jacquin Frank*, for the appellant.

*Thaddeus G. Cowell* of counsel [*Thomas Daly* with him on the brief; *Lord, Day & Lord*, attorneys], for the respondent.

O'MALLEY, J. Plaintiff, a longshoreman, was injured while employed by the defendant in the work of loading one of its vessels. He seeks to hold the defendant liabile upon the theory that it failed to furnish him a "safe place" in which to work. The defense was predicated upon the claim that the place of work was originally safe and that the danger, if any, arose in the course of the plaintiff's employment and as an incident to the prosecution

of the work. The defendant also seeks to avail itself of the doctrine of assumption of risk.

At the close of the plaintiff's evidence the defendant's contentions prevailed and the complaint was dismissed upon the merits. Appellant urges that there were presented questions of fact. While admitting that a " safe place " was originally furnished, it is contended that because of a change in the nature of the plaintiff's employment the defendant failed to discharge the duty owed him to furnish a safe place in which to carry on the new duties imposed. It is further contended that until the defendant discharged this duty it may not claim the benefits of the rule of assumption of risk. In any event it is urged that whether the plaintiff assumed the risk should have been submitted as a question of fact.

The work upon which plaintiff was first engaged started on the afternoon of the day preceding the accident and continued the following morning until about eleven-thirty o'clock. During this time the boat was being loaded with bales of cotton. The plaintiff was one of some twenty men engaged in the work. The men were divided into four gangs of five each and the plaintiff's gang was working aft of the " square of the hatch." The bales were six feet long and about two feet square. Each draft, which was lowered in a rope sling by a block and fall, consisted of four bales. When the draft reached the hold the bales were " floored off " and piled up in tiers. The fifth tier had practically been completed at the time the accident occurred.

Plaintiff's evidence tended to show that because of the irregularity in the shape of the bales there was created an uneven surface upon which the men were required to work. This condition persisted while the bales were being loaded for the reason that after each tier was laid, the men were required to use the top of the surface of the tier as a floor upon which to move the bales into position. The draft, after it reached the hold, would be suspended a distance of about two and one-half feet from the floor, or bales beneath it, and the workmen would then get behind the draft and push it as far as the slack allowed by the winchman would permit.

It is conceded by plaintiff's counsel that the place in which the men were required to load these cotton bales was created in the course of their employment and that if plaintiff had been injured while engaged in this particular work, he would have no cause of action against the defendant.

Just previous to the accident the defendant's foreman directed the men to remove some cotton bales just aft of the " square of the hatch " and make space for the loading of some eighty tons of

copper ingots. The hole made for this purpose was approximately four feet aft of the hatch and some six feet square.

Plaintiff offered evidence tending to show that when this change in the work was ordered he and his fellow-workmen requested the foreman in charge to secure " dunnage " or planks to lay over the uneven surface of the cotton bales so as to afford to the men a smooth flooring surface upon which to work; that it was customary in performing work of this character to have such a smooth flooring space and that it was unsafe to attempt to load copper ingots over the flooring space created by the uneven surface left by the cotton bales.

Accordingly the defendant's foreman gave an order that this dunnage be provided, and as a result one draft of planks was lowered into the hold. However, these were taken and used by one of the other gangs and when the plaintiff and his fellow-workmen again asked for dunnage for their use, they were informed by the defendant's foreman that there was no more available and that the work would have to proceed without it.

Plaintiff's evidence showed that the copper ingots were lowered, not in a rope sling as were the cotton bales, but by means of a " bridle chain sling." This consisted of two single chains with a hook on top and a ring joining the two together with hooks at each end of the chain. These chains would be put around the end of the draft and hooked together, and as the winch started to lower or lift, the weight of the draft would naturally tighten the chain, thereby holding the draft in place; that the security of the draft depended upon keeping the chains tightened by the weight of the draft. The ingots of copper were cigar shaped, about three and one-half feet in length and each draft contained from twenty to twenty-two bars, of an aggregate weight of from 2,000 to 2,500 pounds.

The plaintiff was injured while assisting in receiving the first draft of copper. When it reached a point some two and one-half feet above the surface made by the cotton bales, the plaintiff and his gang got behind it and attempted to push it aft towards the hole or space into which it was to be loaded. As they did this, the winchman continued to slacken the fall so as to allow the draft to be gradually pushed aft. As they reached the edge of the hole the left end of the draft caught on a cotton bale which protruded above the other bales a distance of some six inches. The left end caught against this hummock, and the equilibrium of the draft was destroyed. The chain sling on the left end or side of the draft slackened and in so doing shifted over onto plaintiff's hand. The men continued to push the draft, and in attempting to get it over

the obstruction, the draft suddenly swung clear and into the hole below, where it was to be placed. As the left end of the draft came clear, the chain on the left side suddenly tightened. The plaintiff's hand was caught between the chain and one of the ingots and as the copper " spilled " into the hole, his left thumb was torn off.

It is plaintiff's contention that the accident was caused by reason of the draft being caught on the uneven surface already referred to and that the accident could not have happened if the men had a smooth board surface upon which to work and over which to push the draft.

Plaintiff's evidence further tended to show that there was much less danger in moving a draft contained in a rope sling, such as was used to lower the cotton bales, than in the use of the chain sling, which was dependent at all times for security on the chain remaining taut around the load. Anything tending to cause slack in the chain would be apt to cause injury to the workmen who were required by the nature of their duties to have their hands upon the draft and thus exposed to danger.

We are of opinion that in the circumstances disclosed it may not be said as a matter of law that the defendant had discharged its full duty to the plaintiff. What constituted a " safe place " to work in loading the cotton bales would not necessarily make safe the place in which the copper ingots were to be loaded. There was a decided change in the nature of the plaintiff's work and it was for the jury to say whether the defendant was not required to apprehend the danger arising out of the new situation and to have provided a smooth flooring surface upon which the work might be performed.

It is well settled that the duty of providing a safe place in which to work is non-delegable. (*Yaconi* v. *Brady & Gioe, Inc.,* 246 N. Y. 300, 303.) It is true, of course, that when the progress of the work itself develops incidental dangers, though the place be safe at the beginning, the master fulfills his duty if he furnishes his men with proper means or facilities to obviate these dangers as they emerge from time to time. (*Yaconi* v. *Brady & Gioe, Inc., supra; Madigan* v. *Oceanic Steam Nav. Co.,* 178 N. Y. 242; *Vogel* v. *American Bridge Co.,* 180 id. 373; *Dailey* v. *Stoll,* 211 id. 74.)

In the case before us the danger did not arise from the progress of the work. It is true in a sense that it arose during the work of loading cotton, but when the loading of copper began, this was a new operation and the question of safe place arose anew at the inception of the latter work. (*Blosky* v. *Overseas Shipping Co., Inc.,* 219 App. Div. 438.) In the case before us, unlike the situa-

tion presented in *Yaconi* v. *Brady & Gioe, Inc.* (*supra*), the plaintiff was directed to proceed by a foreman who stood in the position of a representative of the employer and the latter failed, under plaintiff's theory of the case, in providing the men with proper means or facilities to obviate the danger arising from the unevenness of the cotton. In the case cited sawdust was available and its use would have obviated the slippery condition of the floor. Here, the dunnage required was not available.

Nor do we think that as a matter of law the plaintiff must be held to have assumed the risk of such unevenness. While he knew the bales were uneven, he testified that he had no knowledge of the particular projection which caught the draft prior to the happening of the accident. Moreover, the benefit of this doctrine is not available until the master has performed his full duty in furnishing a safe place, and the burden of proving assumption of risk is upon him. (*Dowd* v. *N. Y., O. & W. R. Co.*, 170 N. Y. 459.) Moreover, we are of opinion that, with respect to any assumption of risk, there was presented at least an issue of fact. (*Babcock* v. *Rutland R. R. Co.*, 210 App. Div. 488.)

It follows, therefore, that the judgment appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.

Finch, P. J., McAvoy, Martin and Townley, JJ., concur.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.